**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| JOSEPH COSTANZA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO.: 1:13-CV-260-TLS |
| ) | |
| VULCAN LADDER COMPANY, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

This matter is before the Court on the Motion for Summary Judgment [ECF No. 47] and

the Motion to Exclude Opinion Testimony of Charles Proctor [ECF No. 52], filed by the

Defendant, Vulcan Ladder Company. The Plaintiff, Joseph Costanza, filed a Complaint [ECF

No. 1] in Allen County Superior Court against the Defendant on July 5, 2013, alleging claims of

strict liability and negligence after he fell off the Defendant's 17-foot multiposition ladder. On

September 11, 2013, the case was removed to federal court. [ECF No. 6.] After discovery

concluded, the Defendant filed the Motion and a Memorandum in Support of Summary

Judgment on July 15, 2015, [ECF No. 48]. On July 16, 2015, the Defendant filed its Motion to

Exclude Opinion. On March 31, 2016, the Plaintiff filed a Response to the Motion for Summary

Judgment [ECF No. 64], and in addition filed a Motion for Hearing [ECF No. 66]. On April 15,

2016, the Defendant filed a Reply [ECF No. 68]. On June 9, 2016, the Plaintiff filed its Response

to the Motion to Exclude [ECF No. 74]. The Defendant filed its Reply [ECF No. 75] on June 17,

2016. On June 8, 2016 this court held a Motion Hearing [ECF No. 76]. Both Motions are now

ripe for ruling.

## BACKGROUND

This case arises from an accident involving a Vulcan ES-17T1A-SM 17-foot multipositional, "extendable articulating" ladder manufactured by the Defendant, a foreign corporation or LLC, that the Plaintiff, a resident of Fort Wayne, Indiana and retired firefighter, purchased by a Menards near his home on July 1, 2012. Menards, Inc. was dismissed as a party from this suit earlier during the proceedings.

The ladder comes in a folded-in-half, compact storage position, and can be rotated into two working positions for use as either a stepladder (an "A-frame") or as a straight ladder. In order to pivot the ladder legs into either of these positions, a user must manipulate two central hinges that are located at the top of the ladder when it is in the A-frame position. Each central hinge contains a locking mechanism—called a locking block—that is designed to prevent the hinges from pivoting the ladder legs between positions when the locks are engaged.

By way of example, if the ladder is in the compact folded-in-half position and a user disengages the central hinge locks, when the user rotates the ladder legs outward away from each other, spring pressure will eventually lock the legs in the stepladder A-frame position. A user must then disengage the hinge locks a second time to pivot the legs from the stepladder A-frame position to the straight ladder position, in which the hinge locks are designed to again engage. If a user disengages the locks a third time, the user will be able to fold the ladder from its straight position 180 degrees back to its folded-in-half compact position, without the locks reengaging.

To disengage the hinge locks, a user must depress with a degree of force a knob-like button on the outside of each central hinge. When the two locking blocks reengage, these knob-like buttons spring up from the central hinges. The hinge locks also provide audible "clicking"

noises at two different points when a user rotates the ladder: a click right before and another click right as the locking blocks engage.

The ladder also has two sliding outer ladder assemblies (when viewed from the A-frame) that provide additional length from the primary inner-assembly to which the central hinges are attached. These two outer assemblies are each held in place by two J-hook locks that are used to lock the outer ladder assembly to a user's desired position relative to the inner assembly.

The ladder comes with instructions for how to engage and disengage the hinge locks. The written portion of the instructions appears in two locations, one on the "point of sale" label that is attached to the ladder and the other on a sticker placed on a rail of the ladder. The point of sale instructions read in part:

> **Extension Ladder:** (a) Unlock the two rail locks on top and slide rail to one-half desired height. Relock the two rail locks. (b) Flip ladder over and repeat for other side. (c) Pull two rail sections away from each other until hinge locks click into first locked position. (d) Push in hinge locks and continue pulling rails apart until ladder is completely opened and hinge locks click into upright position for use. (e) Put ladder into upright position for use. (f) Reverse procedures to fold ladder.

(Proctor Report 3, ECF No. 52-3.) The sticker instructions read, "**Hinge Locks** – Pull two rail sections away from each other until the hinge locks click automatically in place." (*Id.*) In addition, the instructions contain a visual depiction of the hinge locks in their locked and unlocked positions, which appear on the point of sale label and a sticker on a rail of the ladder. This visual is below:



   

**Read all instructions before using!**
**¡Lea cuidadosamente todas estas instrucciones antes de usar el producto!**

Keep for future reference / Guarde este manual para futuras consultas
⚠ Make sure all locks are in place and completely locked before using ladder.
⚠ Asegúrese de que todas las trabas se encuentren en su lugar y completamente aseguradas antes de usar la escalera.

(Mot. for Summ. J. 6, ECF No. 48.)

After the Plaintiff purchased the ladder, he brought it to his home, where later that same day he attempted to use it as a straight ladder in order to climb onto the roof of the home from the backyard deck. The deck was outfitted with a trellis roof—a wooden structure with slats above the deck. In positioning the ladder, the Plaintiff sought to climb through the trellis roof and positioned the ladder accordingly to do so. After he unfolded the ladder, the Plaintiff began climbing it until he was close to the roof line. The Plaintiff put his tool belt onto the roof. When the Plaintiff began to step onto the roof, he fell.

The Plaintiff lost consciousness as a result of the fall. When he regained consciousness, he discovered that his legs were entangled in the ladder, which was in its folded position. Shortly after the fall, the Plaintiff's son arrived at the Plaintiff's house and took photographs, which showed that the ladder had been in its folded position. The Plaintiff suffered bilateral fractures to his lower legs, requiring surgeries, complications due to infection, and confinement to hospitals and nursing home facilities for a sustained period of time.

The Plaintiff alleges the accident occurred because when he positioned the ladder, the hinge locks did not engage, even though he had positioned the ladder in its straight position. The

Plaintiff alleges that he thought the hinge locks had engaged because the visual depiction and instructions indicated to him that the ladder would lock after hearing one set of clicking noises, and not two.

## DISCUSSION

### A.    Motion to Exclude

The Plaintiff offers the expert opinion testimony and accompanying report of Dr. Charles Proctor, II, a licensed professional engineer (P.E.) with a Ph.D. in mechanical engineering, and his engineering firm, Proctor Engineering Research & Consulting, Inc. The Defendant asks the Court to exclude the opinion of Proctor pursuant to Federal Rule of Evidence 702. The Defendant contends that Proctor's expert opinion lacks foundation and that its own expert, Jon Ver Halen, demonstrated Proctor's opinions are incorrect.

### 1.    *Rule 702 and Daubert Standard*

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceutical, Inc.*, 509 U.S. 579 (1993). *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 charges trial judges with the responsibility of acting as "gatekeeper[s] with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)). "The purpose of [the *Daubert*] inquiry is to vet the proposed testimony under Rule 702's requirements that it be 'based on sufficient facts or data,' use 'reliable principles and methods,' and 'reliably appl[y] the principles and methods to the facts of the case.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 804 (7th Cir. 2012) (quoting Fed. R. Evid. 702). In

evaluating whether an expert's proposed testimony meets the *Daubert* standard, the court is to "scrutinize the proposed expert witness testimony to determine if it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' so as to be deemed reliable enough to present to a jury." *Lapsley*, 689 F.3d at 805 (quoting *Kumho Tire*, 526 U.S. at 152). Whether to admit expert testimony rests within the discretion of the district court. *See Gen. Elec. v. Joiner*, 522 U.S. 136, 142 (1997); *Lapsley*, 689 F.3d at 810 ("[W]e 'give the district court wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable.'") (quoting *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011)). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis*, 561 F.3d at 705; *see also* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified."). Under Rule 104(a), the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."

District courts apply the *Daubert* framework using a three-part analysis. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). First, the Court must determine whether the proposed witness is qualified as an expert by knowledge, skill, experience, training, or education. If so, the Court must then decide whether the reasoning or methodology underlying the expert's testimony is reliable. If these two requirements are met, the Court must assess whether the expert's proposed testimony will assist the trier of fact in understanding the evidence or to determine a factual issue. *See id.* (citing *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007)).

"Although the court must decide questions of admissibility, the weight and credibility to be accorded expert testimony is properly left to the jury." *Contractor Util. Sales Co. v. Certain-teed Prods. Corp.*, 638 F.2d 1061, 1085 n.32 (7th Cir. 1981). The Defendant will have the opportunity to expose those weaknesses at trial and, as the court in *Daubert* stated, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

**2.     Analysis**

*a.     Objections to Proctor's Testimony Regarding the Accident, Instructions, and Visual Depictions*

The Plaintiff designated Proctor as a testifying expert. The Defendant contends that his expert opinion testimony is inadmissible. During discovery, Proctor provided deposition testimony and an accompanying report in which he listed six engineering opinions:

> 1. The instructions provided with the subject ladder misled [the Plaintiff] into believing that the subject ladder was properly locked prior to his attempt to climb and exit the ladder.
> 2. The instructions provided with the subject ladder lack clarity regarding locking block correct engagement for ladder use.
> 3. The instructions provided fail to inform the user that two "click sounds" will occur for proper locking block engagement.
> 4. The use of an aural indicator to inform the consumer that the subject ladder is correctly locked fails to appropriately communicate to the user of the ladder that, even though the ladder is in the extended position, the locking blocks are not correctly engaged after hearing the first "click."
> 5. The subject ladder lacks adequate visual warning that the locking blocks are not correctly engaged and the ladder is unsafe for use.
> 6. An appropriate and common correction in design and manufacture of the subject ladder would be to color band the locking blocks red or orange and to warn the user that if warning bands are visible, the ladder hinges are not locked and the ladder is unsafe for use.

(Proctor Report 12, ECF No. 52-3.)

The Court first assesses the Defendant's Motion to Exclude with respect to Proctor's opinions on the accident and instructions. The Plaintiff bears the burden of establishing the admissibility of his expert witness. Fed. R. Evid. 702 advisory committee note (2000 Amends.) For the first *Daubert* step, the Defendant does not challenge Proctor's qualifications as an expert witness. Proctor holds a Ph.D. in mechanical engineering from Purdue University and is a licensed P.E. who operates an engineering consulting firm. The Plaintiff has established that Proctor is a qualified expert in this case given his education, qualification as a professional engineer, and his professional background. *See Myers*, 629 F.3d at 644.

Turning to the second *Daubert* step, the Defendant argues that Proctor's reasoning and methodology is insufficient. The Defendant uses the testimony of its own expert, Jon Ver Halen, to prove that Proctor's testimony is not sufficiently supported. Ver Halen has an undergraduate degree and post-graduate studies in engineering, is a registered professional engineer in Illinois, and operates an engineering firm. Ver Halen is also a member of various American National Standards Institute ("ANSI") ladder committees, including the Steering Committee for the ANSI Standard Committee for Ladders, and is the Labeling Task Force Chairman for the Subcommittee for Folding Attic and Stairway Ladders.

Ver Halen opined that Proctor's opinion ignores the illustrations provided in the instructions, which Ver Halen contends provide adequate warning and guidance. He also opined that Proctor's theory of the accident is unsupported by the evidence. (Ver Halen Aff. ¶¶ 18–26, ECF No. 49-4.) The Defendant contends that this is because in assessing whether the Plaintiff's theory of the accident was possible, there are a number of different tests it believes Proctor should have performed in formulating his expert opinion. Proctor did not test whether the ladder would fold on a user if the user did not properly check to make sure the central hinges were

locked. He did not test whether the ladder could support its own weight without the hinges automatically locking. And he did not test whether the user could push on the hinges before climbing it without the hinges automatically locking. The Defendant contends that if Proctor had performed those tests, he would have come to the conclusion that the weight of the ladder alone would have caused the central hinges to lock, and that even if the central hinges were unlocked, the Plaintiff's weight would have caused the central hinges to lock instead.

In response, Plaintiff argues that Proctor did in fact test to determine whether a user would have difficulty understanding the instructions, and that he used appropriate American Society for Testing and Materials ("ASTM") standards to support his opinion. The Plaintiff also argues that Ver Halen's testimony actually supports Proctor's testimony, and as a result creates a genuine issue of material fact precluding summary judgment.

The Court reviews the research and methodology Proctor used in forming the opinions and conclusions cited above. In preparing his report and testimony, Proctor reviewed the Plaintiff's deposition and those of his three sons. [ECF No. 49-1.] He examined ladder instructions, and photographs taken by the Plaintiff's son of the ladder as it was allegedly positioned during the fall. He is familiar with human factors research. In reaching his engineering opinions, Proctor states that he followed ASTM standards.[1] The Court finds that

---

[1] Proctor states in his deposition testimony that he used ATSM standards for "engineering forensics" in which he "collect[ed] information, "maintain[ed] any information or evidence . . . and then provide[d] an analytical conclusion associated with it." (Proctor Dep. 19, ECF No. 65-5.) Proctor's report also provides that:

> Services may include, as necessary, engineering investigation, document review, engineering analysis (as conforming to ASTM E678), anthropomorphic data collection, collection and inspection of evidence (as conforming to ASTM E1188, ASTM E1459, and ASTM E1492), physical and material testing (as conforming to ASTM E860), videography, photography, computer simulation, document research, report preparation, deposition and trial testimony. At the conclusion of investigative analytical activities, and prior to deposition or trial, an oral report

Proctor's methodology and reasoning underlying his opinion regarding the accident and instructions is scientifically reliable for the purposes of summary judgment.

Furthermore, the Defendant's argument that Ver Halen's competing expert testimony excludes Proctor's testimony fails because Rule 702 does not support exclusion on this basis. "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). The Advisory Committee Notes to Rule 702 provide:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the [Rule] on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

Fed. R. Evid. 702, advisory committee's note (2000 amends.); *see Cage v. City of Chi.*, 979 F. Supp. 2d 787, 811 ("[A]n expert opinion cannot be based on facts that are contradicted by undisputed evidence. He may, however, rely on his client's version of any disputed facts."). Here, it was appropriate for Proctor to rely on the Plaintiff's version of events in forming his expert opinion testimony. Furthermore, even assuming the veracity of Ver Halen's competing expert opinion, the Plaintiff sufficiently demonstrated the plausibility of Proctor's theory of the accident, demonstrating that the ladder could be put into the straight configuration without engaging the locks, as well as demonstrating the differentiated "clicks" the locking blocks make as the ladder is configured at the motion hearing.

---

regarding analysis and findings will be provided. Written reports are prepared only at the request of the client. Unless noted otherwise, reports conform to ASTM E620, ASTM E620, ASTM E1020, and ASTM E1732.

(Proctor Report 17–18, ECF No. 49-4.)

Turning to *Daubert*'s third step, the Defendant does not proffer arguments that Proctor's testimony would be unhelpful to the trier of fact. The Court finds that Proctor's testimony will assist the trier of fact in determining the factual issues at hand. *See Myers*, 629 F.3d at 644.

Accordingly, the Court denies the Motion to Exclude with respect to Proctor's testimony regarding the accident, instructions and visual depictions.

b.      *Objections to Proctor's Testimony Regarding Alternative Design*

The Court addresses separately the admissibility of Proctor's sixth expert conclusion and corresponding testimony that "[a]n appropriate and common correction in design and manufacture of the subject ladder would be to color band the locking blocks red or orange and to warn the user that if warning bands are visible, the ladder hinges are not locked and the ladder is unsafe for use." (Proctor Report 12.)

"Indiana law requires that [a] proposed alternative design[] be shown to be cost-effective and able to reduce the injury." *See Lapsley*, 689 F.3d at 815; *Rogers v. Ford Motor Co.*, 952 F. Supp. 606, 617–18 (N.D. Ind. 1997) ("What a plaintiff must show to establish a 'defect' . . . is that an alternative design not only could have prevented the injury (or the enhancement of an injury) resulting from an accident, but that the design was cost-effective under general negligence principles.").

Testing an alternative design provides value to the expert's testimony and can assist a proposed expert in considering: "(1) the alternative's compatibility with existing systems, (2) relative efficiency of the current versus alternative design, (3) short and long term maintenance costs for the alternative design, (4) ability of the proposed purchaser to service and maintain the alternative design, (5) cost of installing the alternative design, and (6) change in cost to the machine." *Winters v. Fru-Con, Inc.* 498 F.3d 734, 742–43 (7th Cir. 2007) (citing *Dhillon v.*

11

*Crown Controls Corp.*, 269 F.3d 865, 869–870 (7th Cir. 2001)). However, "[a]lthough testing an alternative design will likely be advantageous in demonstrating that the proposed expert's testimony is reliable," alternative design testing is not mandated as an absolute prerequisite to the admission of expert testimony because the *Daubert* inquiry is a "flexible" one. *Winters*, 498 F.3d at 742–43 (citing *Cummins v. Lyle Indus.*, 93 F.3d 362, 368–69 (7th Cir. 2002)) (quotations marks removed). District courts may determine that "the proposed expert's testimony regarding an alternative design is reliable despite a lack of testing of the alternative design because the expert has adhered to the "standards of intellectual rigor that are demanded in his or her professional work." *Id.* (quotations and brackets omitted). These factors may include "relying on the data generated by other researchers, making proper personal observations or taking other appropriate actions" where necessary to articulate the rationale. *Cummins*, 93 F.3d at 369 (citing *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318 (7th Cir.1996); *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 901 (7th Cir. 1994); *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 614 n.6 (7th Cir. 1993)). "The appropriateness of the proposed expert's methodology is a question for the district court in its role as a gate-keeper." *Winters*, 498 F.3d at 43.

Although the lack of demonstrative testing is not dispositive in the alternative design inquiry, "skill, observation, common sense, and experience" are not by themselves sufficient proof that an alternative design would prevent injury under Indiana law. *Lytle v. Ford Motor Co.*, 814 N.E.2d 301, 312 (Ind. Ct. App. 2004). Furthermore, an expert that does not support an alternative design opinion by showing that a "cost-benefit formula demand[s] adopt[ion of] the alternative design" will not be permitted to introduce the alternative design at trial. *See Bourne v. Gilman, Inc.*, 452 F.3d 632, 638 (7th Cir. 2006). This is because Indiana imposes a negligence standard rather than strict liability for design defect claims, and therefore the claims are "subject

to understanding that negligence means failure to take precautions that are less expensive than the net cost of accidents." *McMahon v. Bunn-o-matic Corp.*, 150 F.3d 651, 657 (7th Cir. 1998); *TRW Vehicle Safety Sys., Inc. v. Moore*, 936 N.E.2d 201, 208 (Ind. 2010).

The Plaintiff supports the color banding alternative design with testimony from Proctor, and by asserting that testimony from Ver Halen supports his argument. The Defendant argues that the Plaintiff's proffered alternative design is unsupported by Proctor's report and testimony. The Defendant points to a lack of testing performed by Proctor and a lack of supporting testimony that the alternative design proffered is either appropriate or necessary.

After reviewing the record, the Court finds that the Plaintiff's alternative design is not supported and therefore should be excluded. Proctor makes no showing or mention in his report and testimony that "color banding the locking blocks red or orange" would be a cost effective measure, nor did Proctor provide sufficient reasoning that the color bands would be able to reduce injury. Proctor did not test his proffered alternative design in any way. Rather, when asked if he did anything to determine that his proposal would add some sort of additional understanding as to how the locking pins are supposed to lock, Proctor replied:

> I did not do an independent study related to that, but it's in open literature associated with color information. . . . It's just been my past and understanding of my experience. I don't have a specific document that I've pulled as it relates to that. But in regards to safety literature, it's obvious that the colors are of value.

(Proctor Dep. 23, ECF No. 49-2.) Proctor also failed in the course of his testimony to sufficiently articulate the specific ANSI standards he applied, stating that he "didn't pull to put in this file." *(Id.* at 24–25.)

Furthermore, Ver Halen's testimony does not inadvertently provide a sufficient foundation for the Plaintiff's alternative design. The Plaintiff cites to *Siner v. Kindred Hospital*

*Ltd. Partnership*, 51 N.E.3d 1184 (Ind. 2016) for the proposition that an opposing party's expert testimony may be used to establish genuine issues of material fact even if it is contrary to that opposing party's own position. Irrespective of the merits, Ver Halen's testimony pertaining to color banding and the ANSI Z35.4—that some ladders have color banding and conform to the ANSI Z35.4 standard for warning labels (Ver Halen Dep. 59, ECF No. 69-3)—is not a sufficient foundation to show that a color banding alternative design for this ladder would be cost-effective and reduce injury.

Furthermore, Proctor's alternative design is problematic because the Plaintiff admits that he does not allege that the ladder contained a design defect. Rather, the Plaintiff alleges that the Defendant failed to provide sufficient warnings and instructions for using the ladder. *See Hathaway v. Cintas Corp. Servs., Inc.*, 903 F. Supp.2d 669, 674 (N.D. Ind. 2012) (finding that plaintiff proffered an alternative design for an alleged manufacturing flaw instead of correctly proffering an alternative design for a design flaw). Proctor explicitly referred to his proffered alternative design as a "common correction for design and manufacture" of the ladder. (Proctor Report 12.) Not an alternative warning or instruction. Moreover, Proctor does not offer an alternative set of accompanying instructions for this new safety measure and warning beyond the explanatory text of his sixth expert opinion "to warn the user that if warning bands are visible, the ladder hinges are not locked and the ladder is unsafe for use." (*Id.*) "An expert must substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless." *Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999) (internal quotations omitted). Proctor has not sufficiently substantiated his opinion for this alternative design beyond his conclusion.

For the forgoing reasons, the Court grants in part and denies in part the Defendant's Motion to Exclude the testimony of Proctor. The Court grants the Defendant's request to exclude

Proctor's testimony regarding the color banding alternative design. The Court denies the Defendant's request to exclude Proctor's testimony regarding the accident and the sufficiency of the warnings and instructions.

**B.     Summary Judgment**

The Defendant contends there is no triable issue of fact because the testimony of Proctor is inadmissible, and because even if his opinion is considered, the undisputed evidence proves that the only defect the Plaintiff's expert allegedly identified in the ladder could not have caused the Plaintiff's injury. Because the Court finds the testimony of Proctor is admissible, this leaves only the Defendant's latter argument.

*1.     Standard of Review*

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is the moment in litigation where the non-moving party is required to marshal and present the court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. A court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485,

491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

## 2.    *Analysis*

"A federal court sitting in diversity jurisdiction must apply the substantive law of the state in which it sits." *Land v. Yamaha Motor Corp.*, 272 F.3d 514, 516 (7th Cir. 2001) (citations omitted). Whether the Plaintiff can assert a product liability claim is a matter of Indiana state law. The Indiana Products Liability Act (IPLA), governs all actions that are: "(1) brought by a user or consumer; (2) against a manufacturer or seller; and (3) for physical harm caused by a product; regardless of the substantive legal theory or theories upon which the action is brought." Ind. Code § 34-20-1-1. Neither party disputes that the Plaintiffs' claims are governed by the IPLA.

To establish a prima facie case of liability under the IPLA, "the plaintiff must show that (1) the product is defective and unreasonably dangerous, (2) the defective condition existed at the time the product left the defendant's control, and (3) the defective condition is the proximate cause of the plaintiff's injuries." *Nat. Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155, 160 (Ind. Ct. App. 1997). A product may be defective within the meaning of the IPLA because of a manufacturing flaw, a design defect, or a failure to warn of the dangers associated with the product's use. *Cook v. Ford Motor Co.*, 913 N.E.2d 311, 319 (Ind. Ct. App. 2009). For claims based on a design defect or a failure to warn, a plaintiff must establish that the manufacturer failed to exercise reasonable care under the circumstances. *Id.*

The Plaintiff has established that the Defendant manufactures the Vulcan ES-17T1A-SM 17 foot multipositional, "extendable articulating" ladder at issue. The Plaintiff argues that the ladder is defective because the Defendant failed to provide adequate visual warnings for when

the hinge locks are not engaged and failed to provide adequate instructions describing how to ensure the hinge locks actually do engage.

a. *Causation*

Underpinning the Plaintiff's theory that the Defendant failed to provide adequate warnings and instructions for the ladder is that a user could climb the ladder in its straight configuration without the hinge locks engaged and that a user's weight upon climbing would not engage the locks. The Plaintiff contends that when he unfolded the ladder into the straight position, he heard a "clicking sound" and believed that the ladder was in a "safe position or in a locked position." (Costanza Dep. 26–27, ECF No. 49-1.) The Plaintiff alleges that he then climbed onto the ladder without the hinge locks engaging.

The Defendant argues that the Plaintiff's theory of the accident is not possible, and therefore the Plaintiff cannot establish causation. The Defendant contends that even if the Plaintiff mistakenly thought the hinge locks had engaged when unfolding the ladder, the hinge locks would then engage when the ladder is placed in the straight position against the wall because the weight of the ladder will cause the springs in the hinge locks to engage. Alternatively, the Defendant argues that even if the locking blocks had still not engaged after positioning the ladder, the Plaintiff's own weight when climbing the ladder would force the locks to engage. The Defendant provides a video demonstration supporting this theory. (Ver Halen Video, ECF No. 49-8) (manually filed.) The Defendant also proffers the opinion of its expert, that after the Plaintiff had positioned the ladder in the straight position, the Plaintiff caused the accident because he purposefully depressed the knob-like buttons on the side of the central hinges, disengaging the hinge locks. (Ver Halen Aff. ¶ 25, ECF No. 49-4.)

At the Motion Hearing, the Plaintiff's Attorney demonstrated how the ladder could be placed into the straight configuration and climbed without being in the locked position. On review of the record, the Court determines that a reasonable jury could determine that the Plaintiff's accident was the result of the hinge locks not engaging after the Plaintiff unfolded, positioned, and climbed the ladder.

b.    *Adequacy of the Warnings and Instructions*

A product is defective for failing to warn a user if a seller fails to: "(1) properly package or label the product to give reasonable warnings of danger about the product; or (2) give reasonably complete instructions on proper use of the product; when the seller, by exercising reasonable diligence, could have made such warnings or instructions available to the user or consumer." Ind. Code § 34-20-4-2. "The adequacy of warnings is classically a question of fact reserved to the trier of fact and, therefore, usually an inappropriate matter for summary judgment." *Jarrell v. Monsanto Co.*, 528 N.E.2d 1158, 1162 (Ind. Ct. App. 1988).

The Plaintiff argues that the Defendant is liable under the first prong of section 34-20-4-2 because the visual depictions on the point of sale label and sticker do not adequately warn a user for when the hinge locks are not correctly engaged. The Plaintiff also argues that the Defendant is liable under the second section 34-20-4-2, because the Defendant did not provide reasonably complete instructions on the proper use of the ladder. The Plaintiff contends the instructions on how to lock the central hinges when a user is configuring the ladder into its straight configuration are insufficient because the instructions indicate that the ladder would lock after hearing a single clicking sound rather than the two required for it to lock.

The Defendant argues that the visual depictions and instructions are both adequate and sufficiently clear when viewed and read. The Defendant argues this is because the point of sale

and warning label instructions are clear when read in *seriatim*, contrary to the Plaintiff's assertion that they are confusing when read jointly. The Defendant argues that the point of sale instructions for the hinge locks do not specify that the ladder is safe to use after hearing a clicking sound. And for the warning label instructions, the Defendant argues that the sentence "[m]ake sure both locks are fully engaged before use" (Proctor Report 3), makes it perfectly clear that the locks must be engaged before a user climbs on, thus contradicting the Plaintiff's expert witness's testimony. The Defendant also argues that the visual depictions are clear, and that the Plaintiff's own expert has admitted that they are "not particularly" confusing. (Costanza Dep. 42.)

The Defendant additionally argues that because a user must first unfold the ladder from the folded-in-half position into the stepladder A-frame position before unfolding it into its straight position, a user must necessarily manually release the locks at least once before the ladder can be ultimately configured into the straight position. The Defendant contends that the experience of unfolding the ladder from its fold-in-half position to stepladder A-frame position necessarily exposes a user to how the locking blocks work.

Lastly, the Defendant asserts that the ladder and instructions were manufactured under the ANSI 14.2-2007 standard for ladders. The Defendant argues that because the ladder's instructions and visual warnings met this standard, they are sufficiently clear. The Defendant further argues that because the ladder complies with this standard, it has established a rebuttable presumption that the ladder is not defective.

As an initial matter, the Court addresses the Defendant's rebuttable presumption argument. The IPLA creates a rebuttable presumption that a product is not defective and that the manufacturer was not negligent if the product:

(1)     was in conformity with the generally recognized state of the art
        applicable to the safety of the product at the time the product was
        designed, manufactured, packaged, and labeled; or
(2)     complied with applicable codes, standards, regulations, or
        specifications established, adopted, promulgated, or approved by the
        United States or by Indiana, or by an agency of the United States or
        Indiana.

Ind. Code § 34-20-5-1. The Defendant contends that, pursuant to section 34-20-5-1, it has

sufficiently established a rebuttable presumption that the ladder is not defective because it

"complied with ANSI 14.2-2007, and therefore complied with a federal regulation[s]." (Mem. in

Supp. of Summ. J. 20, ECF No. 48.) However, the statute does not provide a rebuttable

presumption for inadequate warnings or inadequate instructions. *Weigle v. SPX Corp.*, 729 F.3d

724, 738–39 (7th Cir. 2013) ("Notably absent from the current statute is a defense or

presumption that adequate warnings render a product not defective and not unreasonably

dangerous."). Accordingly, the Court at this time declines to consider whether the defendant has

established a rebuttable presumption.

        After reviewing the evidence, the Court has determined that there is a genuine dispute of

fact. As addressed above, the Plaintiff and Defendant offer competing testimony as to whether it

was possible for the Plaintiff to unfold, position, and climb the ladder in its straight position

without the hinge locks engaging. Both experts also disagree on whether the instructions and

visual warnings were sufficiently clear. Both experts agree that the hinge locks make a clicking

sound when the springs are loaded into position to engage and that they make a second clicking

sound when the locks actually engage. (Ver Halen Dep. 9; Proctor Dep. 39.) But both experts

disagree on whether the point of sale and sticker instructions clearly state this, or whether the

point of sale and sticker instructions taken as a whole are unclear because they combined only

mention one click occurring. Both experts also disagree on whether the visual depictions

sufficiently articulate the locks engaging and disengaging, even if Plaintiff's expert conceded

that the instructions were not particularly confusing. Whether or not the Defendant provided instructions and visual warnings that were sufficiently clear will rely on the weight afforded to the two experts' opinions, which is a determination that is to be made by the jury. *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) (explaining that the jury must "be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony."). The evidence in this case is not so one-sided or conclusive to resolve this issue at the summary judgment stage, where the Court must construe all facts in a light most favorable to the nonmoving party and view all reasonable inferences in that party's favor. *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000).

At this juncture, there is a genuine dispute of material fact as to the cause of the accident, the adequacy of warning for the hinge locks when they are disengaged, and the clarity of the instructions. Given that the adequacy of warnings and sufficiency of instructions "is classically a question of fact reserved to the trier of fact," *see Jarrell*, 528 N.E.2d at 1162, the Court finds that summary judgment is inappropriate.

## CONCLUSION

For the forgoing reasons, the Defendant's Motion for Summary Judgment [ECF No. 47] is DENIED and the Defendant's Motion to Exclude Opinion Testimony of Charles Proctor [ECF No. 52] is GRANTED IN PART and DENIED IN PART.

SO ORDERED on December 5, 2016.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT